Chief Judge KOZINSKI,
with whom
Judge BEA joins, in deep dissent:
This is folly.
For years, the city of Redondo Beach has had a serious problem with day laborers — sometimes as many as seventy-five — • crowding sidewalks and street-corners, soliciting work from passing motorists. See Appendix 1. As might be expected when large groups of men gather at a single location, they litter, vandalize, urinate, block the sidewalk, harass females and damage property. Cars and trucks stop to negotiate employment and load up laborers, disrupting traffic.[1]
*958 Residents and businesses need not suffer these harms and indignities day in and day out for years on end. It is to secure the safety, beauty, tranquility and orderliness of neighborhoods that municipal governments are instituted among men. Nothing in the First Amendment prevents government from ensuring that sidewalks are reserved for walking rather than loitering; streets are used as thoroughfares rather than open-air hiring halls; and bushes serve as adornment rather than latrines. See Appendix 2. The majority is demonstrably, egregiously, recklessly wrong. If I could dissent twice, I would.[2]
Let’s start at the very beginning, a very good place to start: Is this even a regulation of speech? Sure, it implicates speech, but almost everything implicates communication of some sort; governing would be impossible if price fixing, street-walking, gambling, blackmail, employment discrimination, the sale of human organs, operating a retail business and the gazillion other activities that involve communication were all subject to strict scrutiny. They are not, nor is the impromptu labor market that is the subject of this lawsuit. Cf. City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); One World One Family Now v. City & Cnty. of Honolulu, 76 F.3d 1009, 1015 (9th Cir.1996). Redondo Beach’s ordinance seeks to regulate conduct — precisely the kind of conduct that’s regulated when we require retail establishments to obtain *959 business licenses, maintain health standards, buy insurance and hire workers based on merit rather than race or sex. Panda Express can’t set up a stand anywhere it pleases and start selling moo shu pork to motorists. Any argument that the First Amendment gives them a right to pander to passers-by would be laughed out of court.
But let’s say that what’s being regulated here is speech — why isn’t it a perfectly valid time, place and manner restriction? The ordinance draws no distinctions based on content; it doesn’t favor one kind of speaker over another. What it does is to regulate a very narrow and finely drawn class of conduct: standing around on sidewalks and street corners in order to interact with passing motorists. The majority seems to think this makes the ordinance “significantly overinclusive,” maj. op. at 948, because it “ ‘technically appli[es]’ ” to all manner of conduct my colleagues seem to believe is protected, id. at 948 (alteration in original) (quoting Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 607 F.3d 1178, 1206 (9th Cir.2010) (Wardlaw, J., dissenting) (internal quotation marks omitted)). But what’s remarkable about the majority’s parade of horribles is just how unlikely and contrived they are: children selling lemonade; Girl Scouts selling cookies; “sidewalk food vendors ... advertising their wares to passing motorists” id. at 948;[3] “a motorist who stops, on a residential street, to inquire whether a neighbor’s teen-age daughter or son would be interested in performing yardwork or babysitting,” id. (internal quotation mark omitted); “school children shouting ‘carwash’ at passing vehides,” id. (internal quotation marks omitted).
The judicial imagination can always run wild in conjuring how laws can be misapplied, but the Supreme Court instructs us that “the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.” Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). Rather, “there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.” Id. at 801, 104 S.Ct. 2118. The Court goes on to explain that the effect on third parties can be considered in an over-breadth challenge only to the extent the ordinance will have a “different impact on any third parties’ interests in free speech than it has” on the parties before the court. Id. This is an important limitation that my colleagues overlook, and it wipes out most of their examples: lemonade stands, food carts, cookie vendors, car washers, fund raisers. These activities are far more lovable than a bunch of scraggly men smoking and spitting while waiting for jobs, see infra apps. 1-3, but they’re entitled to no greater protection from regulation: Each involves someone trying to interact with a motorist while he’s still at the wheel. As the Supreme Court explained in Vincent, piling on examples of the same kind of conduct affected by the regulation does not an overbreadth challenge make. 466 U.S. at 801-03, 104 S.Ct. 2118.
*960 We’re left with the driver who stops on a residential street to inquire whether “a neighbor’s teen-age daughter or son” can babysit. Frankly, I’m not keen on having drivers cruising neighborhoods trying to lure teenagers into their cars with promises of employment, and I’m reasonably sure the First Amendment doesn’t give any broad protection to such activities. But to come up with even these far-fetched examples, the majority has to stretch the statutory language to the limit. Why do that? Our job is not to construe statutes broadly so as to imperil their constitutionality; it’s to read them narrowly so as to preserve them. See NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (“The cardinal principle of statutory construction is to save and not to destroy.”); Ashwander v. TVA 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandéis, J., concurring): And the ordinance here can be read quite sensibly to exclude all legitimate over-breadth concerns.
Part (a) of the ordinance makes it “unlawful for any person to stand on a street or highway and solicit, or attempt to solicit, employment, business, or contributions from an occupant of any motor vehicle.” Redondo Beach, Cal, Municipal Code § 3-7.1601 (emphasis added). The operative term here is “solicit,” and it can be read broadly as including all communications with motorists, including holding up a billboard urging drivers to support a political candidate or patronize a local establishment; or it can be read narrowly as requiring a face-to-face conversation with a vehicle occupant for the purpose of consummating a transaction on the spot, such as being hired as a day laborer, obtaining a donation or offering sexual services. It’s obvious that the narrower construction is at least plausible: It’s consistent with a dictionary meaning of the term,[4] as well as its common understanding. It’s also the more plausible meaning, given that the ordinance specifically refers to soliciting employment, which is hard to do while a car is moving. Another important clue is part (b) of the ordinance, which prohibits stopping a vehicle so someone inside can hire or attempt to hire someone outside. Part (b) thus clearly zeroes in on face-to-face communication between people on the sidewalk and people inside the stopped vehicle, which is entirely consistent with a narrow reading of the term “solicit” in part (a). It doesn’t matter whether the narrow reading of “solicit” is the more plausible; it is enough that it’s a plausible meaning, which means we must adopt it rather than striking down the law as unconstitutional. This is a fundamental principle of constitutional law each of us learned during our first year of law school, but some of us seem to have forgotten it.
My colleagues in the majority claim that “solicit” is “not reasonably susceptible” to this narrower reading, maj. op. at 946, but I can’t believe they really mean it.. How can you argue with the dictionary? The interpretation of “solicit” the majority now *961 rejects as implausible is also the meaning we ourselves have given that term for a quarter-century. See ACORN, 798 F.2d at 1268. Rejecting an obvious and sensible interpretation of a common word as implausible will cause profound disruptions in many corners of our law, such as the application of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), where we must determine whether an agency’s interpretation of a statute is plausible.
But it gets stranger still: Redondo Beach didn’t just pick the word “solicit” out of thin air; it did so in reliance on our own construction of the term in ACORN. The record contains a 1987 memorandum by the then City Attorney telling the May- or and City Council that “[t]he proposed ordinance is identical to one recently approved by the 9th circuit court of appeals,” and another written by him a year later describing the ordinance as “prohibiting standing on a street or highway to solicit employment from the occupants of vehicles” (emphasis added). Accordingly, this “statute was based specifically on the Phoenix ordinance upheld by the Ninth Circuit in ACORN.” At oral argument, the City Attorney reiterated: “We took what this court said this ordinance meant. We’ve enforced this ordinance in the manner in which this court said it was to be enforced.” For us now to find Redondo Beach’s ordinance “not reasonably susceptible” to an interpretation the city adopted by slavishly copying language we ourselves approved is so strange I have trouble wrapping my head around it.[5]
If ordinary English and common sense weren’t enough, the history of the ordinance shows quite clearly that the city adopted it to deal with a festering problem: men standing on street corners soliciting work from motorists. Patrol Field Sergeant Rody Contreras, who’s served in the Redondo Police Department since 1986, reports that “[f]or approximately 15 years, the City of Redondo Beach has experienced numerous traffic problems with day laborers who solicit employment at the intersection' of Artesia Boulevard and Felton Lane, and at the intersection of Manhattan Beach Boulevard and Inglewood Avenue.... The Department has received numerous complaints from business owners and residents ... that the day laborers interrupt the flow of traffic while they contact employers from the City sidewalks and streets[,] ... commit acts of vandalism, litter, [and] urinate.... ” City Attorney Michael Webb reports that the city “has received complaints regarding day laborers congregating on street corners at least as far back as 1981. Residents and business owners have complained that the day laborers overcrowd the sidewalks, interrupting the flow of traffic when they contact potential employers; litter; urinate near businesses and in the bush areas of private residences; harass females; and damage property.”
In 1987, the then City Attorney wrote to the Mayor and City Council supporting what eventually became part (a) of the ordinance:. “As the Mayor and Council are *962 aware[,] the City has had extreme difficulties with persons soliciting employment from the sidewalks ... over the last several years.... There can be little question that traffic and safety hazards occur by this practice.” The City Attorney urged passage of “the proposed ordinance!, which] is identical to one recently approved by the 9th circuit court of appeals,” referring to our decision in ACORN, 798 F.2d 1260. When the city moved to enhance the ordinance in 1988 by adding part (b), the City Attorney reiterated these justifications: “This ordinance was designed to alleviate sidewalk congestion and traffic hazards which occurred when large numbers of persons congregated on the sidewalks during the rush hours to obtain temporary employment.”
Supporting the 1988 amendment, the North Redondo Beach Business Association wrote to the Mayor complaining about “the gathering of day laborers.” The Association commented: “We all know this problem has existed for many years. We noticed that it almost diminished shortly after [part (a) of] the ordinance was passed [but] realize that unless there is constant re-enforcement, the problem resurfaces on a frequent basis.”
In response, the Mayor wrote to the City Council, noting “the recurring gathering of day laborers.” She urged “that appropriate actions be taken to eliminate this problem of congregating day laborers.” This produced part (b) of the ordinance, which applies to motorists who stop to pick up day laborers: “By adopting this amendment, both the prospective employee and employer would be subject to a misdemeanor offense for soliciting the other from a street or highway.” With both parts of the ordinance in place, city officials launched vigorous efforts like the “Day Laborer Enforcement Project” to clean up their city in ways not previously possible. There was no “Girl Scout Cookie Enforcement Project,” “Lemonade Stand Enforcement Project,” “Push-Cart Vendor Enforcement Project” or any other of the horrible abuses the majority fears the ordinance will be subject to.
The drafting and enforcement history is thus entirely consistent with a commonsense reading of the ordinance as applying only to people on sidewalks looking to stop passing motorists so they can deal with them. The city enforces the ordinance consistent with this narrow meaning. Sergeant Contreras, in a sworn declaration, reports that in enforcement operations “[d]ay laborers were only contacted and arrested when they were on the sidewalk and approached a stopped vehicle. The prospective employer who was charged with violation of [the ordinance] was contacted because he stopped in a traffic lane to conduct a hiring discussion with day laborers.”
There is no evidence that the city has ever enforced, threatened to enforce or dreamt of enforcing the ordinance against sidewalk food vendors, tyke lemonade moguls, Girl Scout cookie peddlers, high school car washers, disaster relief solicitors or middle-aged men cruising neighborhoods looking to pick up teenage girls from their front yards. Plaintiff has shown none of the realistic dangers that the Supreme Court said must be shown in making a facial challenge. Vincent, 466 U.S. at 801, 104 S.Ct. 2118.
City Attorney Webb declares that the city “interprets and enforces the Ordinance as prohibiting solicitations that cause drivers of motor vehicles to stop in traffic.” As the Supreme Court has instructed us, when considering a “facial challenge, we must consider the [city]’s authoritative constructions of the ordinance, including its own implementation and interpretation of it.” Forsyth Cnty. v. Nationalist Movement, 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).
*963 The majority turns up its collective nose at the city’s proffered interpretation as somehow not authoritative enough, maj. op. at 945-47, but I’m at a loss to understand why a declaration from the city’s top law enforcement official doesn’t cut the mustard. Time and again, the Supreme Court has accepted the construction of a statute proffered by a state, county or city. See, e.g., Forsyth Cnty., 505 U.S. at 131, 112 S.Ct. 2395; Ward v. Rock Against Racism, 491 U.S. 781, 795, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). In Forsyth, the Court explained that it considered the county’s own interpretation to be “authoritative”: “In the present litigation, the county has made clear how it interprets and implements the ordinance.” 505 U.S. at 131, 112 S.Ct. 2395 (emphasis added). If that’s good enough for the Supreme Court, why isn’t it good enough for us? [6]
My colleagues reject the city’s proposed construction with the excuse that they “cannot simply presume the City will act in good faith and adhere to standards absent from the ordinance’s face.” Maj. op. at 946-47 (internal quotation marks and alterations omitted). Good faith has nothing to do with it. If we construe the ordinance to avoid constitutional concerns, our interpretation then defines what the ordinance means. If the city were to enforce it more broadly in the future, it would be subject to a ■swift injunction: Not only would it be barred by the law of the circuit, judicial estoppel would also preclude it from pressing a broader reading of the ordinance in a future case. See, e.g., New Hampshire v. Maine, 532 U.S. 742, 749-51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). In other words, if Redondo Beach were to win here based on its proffered construction, it would be stuck with it.
The majority also argues that the ordinance is overbroad because the city has less intrusive means to deal with the problem, such as enforcing existing traffic laws. Maj. op. at 949-50. But city authorities have tried for years to use other laws to deal with day laborers. Sergeant Contreras recounts that “[njumerous warnings, both verbal and written, have been given to the day laborers over the years, which have had little or no effect on the problems they create. Random enforcement has proven to be ineffective or only a temporary solution.” City Attorney Webb informs us that, over the past three decades, “[t]he City made numerous efforts to address these complaints, including enforcement of other applicable laws, but these efforts were largely unsuccessful.”[7] Business leaders complained that, “unless *964 there is constant reenforcement, the problem resurfaces on a frequent basis.” I suppose Redondo Beach could park a patrol car and two officers permanently at each of the affected locations to make sure no one violates the parking and littering laws, but this is an extraordinary expense for a small city to bear. Nothing in the First Amendment commands such a sacrifice.
The bottom line is that city officials, after years of effort, found existing tools inadequate or too expensive to rid the city’s streets of day laborers. Appointing themselves as a Super City Council, my colleagues — who need not answer to the voters — decide that they know how to run Redondo Beach better than its elected officials. Id. at 949-50 (giving helpful advice as to which laws to enforce to get rid of the problem). This kind of overreaching can only lead to erosion of public confidence in the judiciary. For my part, if city officials swear under oath that they have tried to use existing laws to no avail, I will take their word for it — especially when there is nothing but judicial speculation to contradict them.
In a remarkable passage, the majority claims the ordinance is “geographically overinclusive” because it “applies citywide to all streets and sidewalks in the City, yet the City has introduced evidence of traffic problems only with respect to a small number of major streets and medians.” Id. at 949. This is a new one on me. Since when are cities and states precluded from passing laws of general applicability because problems manifest themselves only at specific locations? How exactly is a city to ensure that a problem cured by a spot ordinance at one location won’t migrate *965 elsewhere? Are city officials truly precluded by the First Amendment from exercising legislative judgment in dealing with the city’s current and future problems in a citywide ordinance?
Finally, the majority brushes aside the possibility of saving part of the ordinance. Id. at 951 n. 10. This is surprising, as there are very good reasons for severing part (b) from part (a). Each part deals with a different aspect of the problem: (a) regulates day laborers and (b) regulates those who drive by and try to hire them. They address fundamentally different conduct, by different groups of people; the sections were passed at different times; and each section can stand without the other’s help. Indeed, when it comes to construing the two sections, the majority treats them as if they’re totally unrelated, refusing to read part (a) narrowly in light of part (b). But when it comes to throwing them overboard, the majority shackles them together.
Virtually all of the problems the majority has imagined apply to part (a) of the ordinance, not to part (b). Part (b) can easily stand on its own and would achieve a good deal of the city’s objective, much as an ordinance prohibiting the patronizing of streetwalkers, if enforced, would go a long way toward cleaning up a red light district. If my colleagues are bent on striking down the entire ordinance, they must find something wrong with part (b) independent of part (a). This they never do.
For a federal court to strike down a state law as constitutionally repugnant is an exercise of enormous power; it strains federal-state relations and undermines popular sovereignty by limiting the authority of elected officials to serve their constituents. It’s a power we should exercise cautiously and narrowly — as a scalpel rather than a machete. One way of diminishing this tension is for a court to invalidate only that part of an offending statute that runs afoul of the Constitution and leave in place those portions that are valid. This usually causes the least damage to the statutory scheme, and thus the least friction between the federal government and the states. It is for that and many other reasons the prudent thing to do. See, e.g., Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 501-07, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985) (severing a state statute after striking down part of it on First Amendment grounds); Marsh v. Alabama, 326 U.S. 501, 509-10, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (striking down on First Amendment grounds only a single application of a state statute); Cantwell v. Connecticut, 310 U.S. 296, 307-11, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (striking down on First Amendment grounds a state statute only with respect to one application of it); see also Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 328-31, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (striking down on First Amendment grounds a state statute but remanding for a determination of severability); City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 772, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (doing the same for a city ordinance). See generally David H. Gans, Severability as Judicial Lawmaking, 76 Geo. Wash. L.Rev. 639, 653 (2008) (“Severability doctrine avoids [a] disastrous state of affairs [by] permit[ting] a court to save as much as it can of the legislature’s handiwork....”). As the Supreme Court instructs us, it is “the normal rule that partial, rather than facial, invalidation is the required course.” Brockett, 472 U.S. at 504, 105 S.Ct. 2794.
Not all statutes are readily severable. Sometimes the offending provision is so intertwined with other parts of the statute that it’s impossible to sever only the offending part; at other times, severing just one key part of the statute so distorts the statutory purpose that it’s more prudent to *966 strike down the whole. See, e.g., Randall v. Sorrell, 548 U.S. 230, 262, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006) (striking down a state statute on First Amendment grounds and finding that “to sever provisions ... would require us to write words into the statute”); Hill v. Wallace, 259 U.S. 44, 70, 42 S.Ct. 453, 66 L.Ed. 822 (1922) (refusing to sever a federal statute despite the presence of a severability clause because the unconstitutional section was “so interwoven” that other sections “cannot be separated. None of them can stand.”).
In general, however, severing the offending provision is the more prudent course. This is the view adopted by the California Supreme Court in Gerken v. Fair Political Practices Comm’n, 6 Cal.4th 707, 25 Cal.Rptr.2d 449, 863 P.2d 694 (1993), where it reaffirmed a three-part test for when severance is appropriate: “[T]he invalid provision must be grammatically, functionally, and volitionally separable.” Id., 25 Cal.Rptr.2d 449, 863 P.2d at 698 (internal quotation mark omitted). The Supreme Court has made clear that “[s]everability of a local ordinance is a question of state law,” Lakewood, 486 U.S. at 772, 108 S.Ct. 2138, so we must adhere to the state supreme court’s view as to whether to strike down the ordinance in its entirety or only in part.
Part (b) of Redondo Beach’s ordinance breezes through the Gerken test. Grammatically, it’s an obvious stand-alone. Functionally, it targets potential employers of day laborers and operates just fine on its own. And volitionally, there’s every reason to believe that the city “would have separately considered and adopted [it] in the absence of the invalid portions.” Gerken, 25 Cal.Rptr.2d 449, 863 P.2d at 699 (internal quotation mark omitted). Indeed, the city adopted part (b) of the ordinance twenty months after part (a). Thus, if the majority is going to strike down any portion of section 3-7.1601, it should strike down only part (a) and leave intact part (b), whose constitutionality no one has colorably called into question.
The majority insists, yet again, that the city waived the issue. Maj. op. at 951 n. 10. It’s true that litigants typically must present arguments for courts to adopt, but severability’s not a typical argument. Severability comes into play as a court fashions its remedy upon finding part of a statute unconstitutional. Having reached that conclusion, the court can’t escape the question of how much of the statute to take down. It is an inherent part of the process of constitutional adjudication, and we certainly shouldn’t make our default to take down everything. To the contrary, we should presumptively preserve as much as possible.
The very case cited by my colleagues illustrates this point. In Legal Services Corp. v. Velazquez, 531 U.S. 533, 549, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001), the Court did not find severability waived, though it wasn’t “discussed in the briefs of either party or otherwise contested here.” Instead, the Court simply exercised its “discretion and prudential judgment” in declining to address it. Id. And the Court made even clearer in Brockett that it could and would opt for severability even when the state didn’t seek it.. The plaintiffs in Brockett argued that, “given that appellants did not argue ‘severability’ in the Court of Appeals, they are precluded from raising it in this Court on appeal.” Brief for All Appellees at 44, Brockett, 472 U.S. 491, 105 S.Ct. 2794 (Nos. 84-28 and 84-143). But, after finding a part of the statute unconstitutional, the Supreme Court deemed it “quite evident that the remainder of the statute retains its effectiveness .... In these circumstances, the issue of severability is no obstacle to partial invalidation, which is the course the *967 Court of Appeals should have pursued.” Brockett, 472 U.S. at 507, 105 S.Ct. 2794; see also United States v. Booker, 543 U.S. 220, 322, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (Thomas, J., dissenting in part) (discussing instances where the Supreme court has applied severability when “the parties in those cases could have raised the issue of severability, but did not bother, because (as is often the case) there was no arguable reason to defeat the presumption of severability”); Velazquez, 531 U.S. at 559, 121 S.Ct. 1043 (Scalia, J., dissenting) (“Although no party briefed severability in Denver Area Ed. Telecommunications Consortium, Inc. v. FCC, 518 U.S. 727, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996), the Justices finding partial unconstitutionality considered it necessary to address the issue. Id., at 767, 116 S.Ct. 2374 (plurality opinion) (‘[W]e must ask whether § 10(a) is severable’); accord, New York v. United States, 505 U.S. 144, 186, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). I think we have that same obligation here.”). Even when the Supreme Court ultimately rejects severability, it still considers it as a possibility even if the parties made no mention of the issue in their briefs. See, e.g., Randall, 548 U.S. at 262, 126 S.Ct. 2479. It’s diametrically opposed to the Supreme Court’s practice for my colleagues to dismiss on waiver grounds the obvious possibility of severability here.
I find it heavy-handed and arbitrary for the majority to take down part (b) of the ordinance even though no one — not the parties, not the majority, not the district court — has suggested in any way that it’s unconstitutional standing on its own. That’s like taking out a healthy gall bladder because you’ve removed an abscessed appendix. The majority obviously needs schooling in the Hippocratic oath.
I add only a few words about Judge Smith’s concurrence which, fortunately, a majority of the court abjures. According to Judge Smith, the ordinance suffers from two additional constitutional infirmities: It’s not content-neutral and it doesn’t leave adequate alternative channels for communication. The first point is foreclosed by Hill v. Colorado, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000), as even the concurrence seems to recognize. Special Concurrence at 953 (“I recognize that the Supreme Court’s decision in Hill v. Colorado, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000), could be read to cast some doubt upon this conclusion.”). Perhaps Judge Smith’s critique of Hill will persuade the Court to take up our case and overrule Hill but, until it does, we are wise to decide our case consistent with it.
As for adequate alternative channels of communication, no one prohibits the day laborers from advertising in the newspaper or on Craigslist — and many do. Others participate in the six day-laborer centers in Southern California. The centers are easy to find and patrons interested in hiring day laborers can travel to them with a minimum of inconvenience. It is, of course, easier to hire laborers nearby, but there is a crucial difference between having no alternatives and having slightly inconvenient alternatives. See, for example, Appendix 3.
* * *
Judge Gould strikes down the ordinance because the city fails to establish a dedicated day laborer solicitation area. But why does every city need to set aside an area for day laborers to congregate? I’m aware of no such constitutional mandate, and it strikes me as overkill.
There are 482 municipalities in California — eighty-eight in Los Angeles County alone — and they range from Los Angeles, with almost 3.8 million people and over 500 square miles, to Amador City, with just 185 people and less than one-third of a square mile. Indeed, Redondo Beach is *968 one of nine municipalities tucked along a twelve-mile stretch of coastline. Following the coast north to south, there are El Segundo (16,654 people; 5.5 square miles), Manhattan Beach (35,135 people; 3.9 square miles), Hermosa Beach (19,506 people; 1.4 square miles), Redondo Beach (66,748 people; 6.2 square miles), Palos Verdes Estates (13,438 people; 4.8 square miles), Rancho Palos Verdes (41,643 people; 13.5 square miles), Rolling Hills Estates (8067 people; 3.6 square miles) and Rolling Hills (1860 people; under three square miles). Towering over all of this is gigantic Torrance (145,438 people; 20.6 square miles).
I see no basis for requiring every single one of these mini-municipalities to “designate! ] a permissible area for day laborer solicitation,” concurrence at 951, whether it encompasses 500 square miles or just 1/1500 of that, or whether it’s overwhelmingly residential, like Rolling Hills Estates, or almost entirely commercial, like the City of Industry with its 219 residents and 80,000 jobs. And it’s positively outre to do so while chastising the majority for “mak[ing] it so hard for municipalities ... that these municipalities cannot achieve important public goals.” Id. As Appendix 3 shows, denizens of Redondo Beach can drive just six miles outside their city and find day laborers waiting to be hired. Why isn’t that close enough? Where in our First Amendment law does it say that, if you live in Redondo Beach, you must have nine day-laborer solicitation centers within a ten-minute drive?
I would vacate the judgment of the district court and remand with instructions that it enter judgment for defendant.
Appendix 1
[[Image here]]
*969 [[Image here]]
Appendix 2
[[Image here]]
*970 Appendix 3
[[Image here]]
.Sons)! Verwm Av«-raie jtisf .vutfh of P«ciffc Coast Bifiw-ay, .San Pedso. Cáüfoim*, í£í)jií<íícíii«ubÍv six ¡mks Beach, kwa*-dowpidadwi JM; l $. IM L j 1; V) PM. from

. The majority recognizes that "the Ordinance may have been enacted in part to reduce public nuisances such as littering, vandalism, public urination, and harassment of pedestrians,” but doesn't consider these justifications because "the City does not argue on appeal that the Ordinance is narrowly tailored to achieve these goals.” Maj. op. at 947 n. 6. But the city mentions these problems no fewer than six times in its opening brief (Blue Brief at 7, 12, 13, 42, 48 and 63, which includes the fact section, the summary of argument and the section dealing with narrow tailoring). Here’s a sample:
c. The Ordinance Is Narrowly Tailored to Promote the City's Recognized Significant Government Interests. i. The Ordinance Meets the Ward Standard for Narrow Tailoring.
The only factual distinction between this case and ACORN is that ACORN addressed the application of an essentially identical ordinance to people who went *958 into the street to solicit cars that already had stopped at a red light. Here, the Ordinance is applied to people who, by their actions, cause cars to stop in traffic. There is no principled distinction between these two factual scenarios that changes the conclusion that both ordinances are narrowly tailored. Indeed, the facts here show a greater traffic safety impact than the facts of ACORN. The public safety issues in this case- — interruption of and congestion of traffic, vandalism, litter, urinating in public, and occasional fights (Contreras Decl., ¶ 3, ER:168) — are more significant than the impeding of a vehicle's re-starting that this Court approved in ACORN.
Blue Brief at 36, 42. The city reiterates the argument in its reply brief (Grey Brief at 7, 11-12, 15, 17 and 21). The district court record is chock-full of declarations and exhibits documenting these problems, and the district court's opinion devotes an entire section to them. Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 475 F.Supp.2d 952, 963-64, 966 (C.D.Cal.2006). The majority's claim that the city waived this argument is an invention.
The city’s primary focus in its briefing is on traffic problems because the controlling authority at the time the briefs were written was ACORN v. City of Phoenix, 798 F.2d 1260 (9th Cir.1986), which emphasized traffic flow and safety in upholding the very similar ordinance there. Id. at 1268-70. The city had no way of knowing the case would go en banc and a twenty-five-year-old precedent would be overruled. See maj. op. at 947 n. 5. It thus had no reason to argue the other reasons justifying the ordinance with equal vigor.
Unbelievably, the majority holds that the city waived all of these grounds because it did not anticipate that we would overrule ACORN, and thus did not offer supplemental briefing or discuss the matter at oral argument. Maj. op. at 947 n. 6. But the city had no reason to initiate such briefing or argument because plaintiffs did not argue that ACORN should be overruled. It will come as a rude shock to members of our bar to learn that failure to ask for supplemental briefing in order to argue that an en banc court should not overrule a precedent amounts to a waiver, which then precludes a party from arguing that it is entitled to prevail even if the court overrules the precedent sua sponte and without asking for briefing from the parties. Not only does the majority overrule ACORN without obtaining the views of the parties, it adopts a draconian waiver rule that violates all reason and justice. And to what end? Just so my colleagues can shut their eyes to inconvenient facts in the record that stand in the way of the outcome they wish to reach. Have we really come to this?

. I am authorized to state Judge Bea would also join such second dissent.

. The Redondo Beach City Council was, in fact, worried about the traffic problems that might be caused by street vendors and thus strictly limited such vendors in time and place. Sidewalk food vendors are allowed in Redondo Beach only during the summer season and only along one side of the street bordering the beach. Redondo Beach, Cal., Municipal Code §§ 3-7.2001(d), 3-7.2004.

. As the majority acknowledges, maj. op. at 946, the third edition of Webster’s New International Dictionary defines "solicit” as “to make petition to” and "esp[ecially ]: to approach with a request or plea (as in selling or begging).” Webster's New International Dictionary 2169 (3d ed. 1981). This very clearly contemplates a face-to-face interaction. And the sainted Webster's Second defines "solicit” as: "To make petition to; to entreat; importune; as, to solicit the king for relief; now, often, to approach with a request or plea, as in selling, begging, etc.; as, to solicit one’s neighbors for contributions.” Webster’s New International Dictionary 2393 (2d ed. 1939). The notion of approaching someone physically — as a day laborer or street walker must approach a parked car to solicit employment — seems a well-entrenched meaning of the term.
We’re each entitled to our own view of the law but not to our own language.

. The majority cites Board of Airport Commissioners of L.A. v. Jews for Jesus, Inc., 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987), to support its conclusion that the ordinance can’t be salvaged by a narrow reading. Maj. op. at 946-47. That case proves just how wrong my colleagues are. The restriction struck down there banned all “First Amendment activities within Central Terminal Area at Los Angeles International Airport.” Jews for Jesus, 482 U.S. at 571, 107 S.Ct. 2568. When the law in question is an absolute prohibition of constitutionally protected activities, there is no way to read it narrowly. Here, we have an ordinance that uses common language that can be read narrowly. Our case has nothing in common with Jews for Jesus.

. The majority argues that: "Apparently the Dissent agrees with us that the City’s proposed interpretation is untenable." Maj. op. at 946 n. 4. Nice try. In fact, I disagree with every word in the opinion, including "the,” "and” and "or.” Here’s what the city actually argues: "The Ordinance is enforced only against solicitors who stand on the sidewalk or street and cause motorists to stop in traffic lanes in response to the solicitation.” Blue Brief at 13. The city is saying that it interprets the ordinance as using "solicit” in the narrow sense — that is, involving a face-to-face interaction. Individuals such as street vendors, day laborers and street walkers, who seek to have face-to-face interactions with motorists, cause them to stop; there's no other way to do business with someone in a moving vehicle. Obviously, I agree with this argument — contrary to what my colleagues in the majority seem to think.

. The majority dismisses Webb’s declaration as inadmissible. Maj. op. at 950 n. 9. But material produced at the summary judgment stage need not be in the form of admissible evidence. It’s for that reason that Federal Rule of Civil Procedure 56(c)(1)(B) directs the court’s inquiry to whether "an adverse party *964 cannot produce admissible evidence to support the fact”; that 56(c)(2) permits a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence”; and that 56(c)(4) requires that affidavits “set out facts that would be admissible in evidence” (emphases added). Rule 56 is precisely worded to exclude evidence only if it’s clear that it cannot be presented in an admissible form at trial.
Accordingly, we held in Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir.2003), that, ”[a]t the summary judgment stage, we do not focus on the admissibility of the evidence’s form. We instead focus on the admissibility of its contents.” Similarly, in Block v. City of L.A., 253 F.3d 410, 418-19 (9th Cir.2001), we held that, ”[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56.” See also Adam N. Steinman, The Irrepressible Myth of Celotex: Reconsidering Summary Judgment Burdens Twenty Years After the Trilogy, 63 Wash. & Lee L.Rev. 81, 130 (2006) ("Materials offered in opposition to summary judgment ... are not offered to establish the truth of the matter asserted. They are offered to establish a genuine issue of material fact for trial.”). As Fraser and Block make clear, the question at summary judgment is not whether the form of the evidence presented is admissible, but whether the content is. At trial, the cily could easily present admissible evidence of what’s in Webb’s declaration. For example, former city officials could testily to their personal recollection about their failed attempts to address the city's day laborer problem with ordinances predating this one.
In its Herculean effort to suppress portions of the record it doesn’t like, see also pp. 957-58 n. 1 supra, the majority upends thus yet another line of authority that stands in its way, sub silentio overruling Fraser and Block. And, in what has now become its calling card, the majority doesn’t bother giving the parties an opportunity to brief the issue before mowing down our long-established case law. One must wonder whether the majority is even aware of the cases it casually tramples underfoot.
This will be another alarming signal to members of our bar, instructing them that they can no longer proffer shorthand previews of potential evidence at the summary judgment stage but must prepare and submit the entire trial record. We will rue the day we started down this perilous path.